IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ISABELLA PACL, | ) | Case No. 1:19-cv-1165 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Isabella Pacl, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, a period of Disability Insurance benefits ("DIB") under Title II of the Social Security Act and Widow's Insurance benefits.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 11.  Because the ALJ failed to apply proper legal standards in evaluating the weight assigned to Dr. Janineh's treating source opinion and apparently failed to consider all relevant medical and other evidence in determining Pacl's residual functional capacity ("RFC"), the Commissioner's final decision denying Pacl's applications for SSI and DIB must be VACATED and her case REMANDED for further consideration consistent with this memorandum opinion and order.

## II.     Procedural History

Pacl applied for SSI and DIB on September 23,2014.  (Tr. 1946, 2224, 2231).[1]  She alleged that she became disabled on June 18, 2013, due to dysautonomia, postural orthostatic tachycardia syndrome, inappropriate sinus tachycardia, multiple compression fractures in spine (T7, T9) and legal blindness in her left eye.  (Tr. 2231, 2273).  The Social Security Administration denied Pacl's applications initially and upon reconsideration.  (Tr. 2078-2085, 2090, 2101).  Pacl requested an administrative hearing.  (Tr. 2102).  ALJ George Roscoe initially heard Pacl's case and denied her claims in a March 3, 2017 decision.  (Tr. 2050-2062).   The Appeals Council vacated and remanded ALJ Roscoe's decision on August 8, 2017.  (Tr. 2071).

ALJ Roscoe held another hearing on March 29, 2018 and heard testimony from Ms. Pacl, a medical expert ("ME") and a vocational expert ("VE").  (Tr. 1863-1890).  He issued a second decision denying Pacl's claims on June 19, 2018.  (Tr. 1836-1861).  On April 18, 2019, the Appeals Council denied further review, rendering ALJ Roscoe's decision the final decision of the Commissioner.  (Tr. 1-4).  On May 21, 2019, Pacl filed a complaint seeking judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.     Evidence

### A.     Relevant Medical Evidence

Pacl's medical record shows repeated emergency room visits, hospitalizations, specialist evaluations and diagnostic testing.  In 2014, Pacl went to the emergency room several times for worsening symptoms of left-sided headache, chest pain, and tachycardia.  (Tr. 2354-2360, 2365-2368, 2369-2378).  Laboratory testing, CT scans, chest x-rays and D-dimer test were normal. (Tr. 2355, 2367, 2371).  She was admitted to the Cleveland Clinic Foundation ("CCF") twice in

---

[1] The administrative transcript is in ECF Doc. 9.

August 2014 after additional emergency room visits for episodes of palpitations and tachycardia seemingly exacerbated by viral illnesses.  (Tr. 2411-2423, 2425-2435, 2435-2439).  Pacl had a history of recurrent tachycardia, but her episodes increased following pregnancy and the birth of a child in 2013.  A tilt-table test increased her heart rate to 170 beats per minute (bpm) with no orthostatic hypotension.  (Tr. 2380).  She was treated with a beta-blocker and an increased dosage of metoprolol for a provisional diagnosis of inappropriate sinus tachycardia and buspirone for anxiety attack to be followed for evaluation of behavioral changes with arrhythmic illness.  (Tr. 2380, 2421, 2423).

Pacl started treating with Jouliana Janineh, D.O., in August 2014.  In September 2014, Dr. Janineh gave Pacl a handicap placard and noted that she was unable to do normal activities because of POTS.  "She gets extremely dizzy and her heart rate accelerates."  (Tr. 2563).

Pacl was treated several more times at emergency departments in 2014.  She was also evaluated by specialists for chief complaints of postural orthostatic tachycardia syndrome ("POTS"), with syncope, heart racing, palpitations, chest pain and shortness of breath.  (Tr. 2381-2385, 2386-2390, 2391-2393, 2394-2396, 2397-2400).  An exercise test was terminated due to an increasing upper abdomen "burning" sensation.  (Tr. 2385-2386).  A specialist in the Neuromuscular Institute Syncope and Autonomic Center believed Pacl probably had hyperadrenergic[2] POTS and recommended continued use of metoprolol and Florinef, increased water intake and dietary sodium, a graded aerobic exercise program and that she address her anxiety and depression, if present.  (Tr. 2395).

In 2015, Pacl was treated approximately 20 times in the emergency room at Southwest General Hospital ("SWGH").  (Tr. 2974-2981, 3016-3020, 3023-3028, 3246-3351, 3263-3268,

---

[2] High adrenaline.  https://myheart.net/pots-syndrome/types/ (last visited May 4, 2020).

3314-3323, 3327-3466).  On March 10, 2015, emergency room notes stated that Pacl was immunocompromised and had a history of autonomic dysfunction.  (Tr. 2977).  In June 2015, Pacl was transferred to CCF after IV hydration and IV Lopressor failed to improve her tachycardia.  Her heart rate was as high as 190 bpm when she arrived at the emergency room and in the 150s with any slight exertion.  (Tr. 3026).  Her POTS symptoms were exacerbated by a recent bout of sinusitis.  (Tr. 3134-3135).  She was discharged with diagnoses including anxiety disorder, which she denied even though she had been taking Xanax.  (Tr. 3140).  She was advised to follow-up with psychiatry.  (Tr. 3140).

At an emergency room visit on June 26, 2015 Pacl reported that she had hired home health care services to administer IV fluids at home.  (Tr. 3246, 3274-3275).  She continued to seek emergency room treatment in 2015, reporting "heart racing," dehydration and exacerbating factors with any infection.  She reported that beta blockers had not helped.  (Tr. 3023, 3246, 3314, 3342).  On October 4, 2015, Pacl was transferred from SWGH to CCF for intractable tachycardia.  (Tr. 3346)  She reported that she had about three to four days per month that she felt well and that her heart-related symptoms typically followed cold/flu symptoms.  (Tr. 3375).  Cardiac testing was normal (EKG, enzymes, echo, blood cultures).  Because she had shortness of breath, testing was conducted to rule out blood clotting (D-dimer, DVT ultrasound).  (Tr. 3375).  During her admission, a physical therapist noted Pacl's increased heart rate, with activity and rest.  (Tr. 3385-3386).  The attending physician noted that Pacl had a "challenging situation with refractory symptoms despite conventional therapy for POTS."  He opined that she would benefit from a multi-disciplinary approach including treatment for anxiety and functional mobility; her symptoms seemed out of proportion to the objective findings.  (Tr. 3474).

On November 13, 2015, Dr. Rebecca M. Kuenzler evaluated Pacl in CCF's Neuromuscular Center.  (Tr. 3470-3479).  Dr. Kuenzler opined that Pacl's diagnosis of POTS, by tilt-testing, was not neurogenic based on normal lab and reflex testing.  She offered to repeat studies to determine if her symptoms were autoimmune or hyperadrenergic.  (Tr. 3470-3471).

Kenneth Mayuga, M.D. evaluated Pacl at the Cardiac Pacing and Electrophysiology department of CCF's Heart and Vascular Institute on November 30, 2015.  (Tr. 3480-3491).  Pacl reported daily chest pain, weakness, frequent tachycardia, lightheadedness, extreme nausea and headaches.  (Tr. 3481).  In reviewing Pacl's records, Dr. Mayuga noted that POTS was again seen on orthostatics and that Pacl was currently taking medication to suppress chronic Epstein-Barr virus to alleviate her POTS symptoms.  (Tr. 3485-3486).  He explained that ablation and chronic indwelling catheters were not recommended for patients with POTS.  (Tr. 3486).

During December 2015, Pacl was seen at SWGH at least eight more times for chest pain, shortness of breath, tachycardia and abdominal pain.  She was transferred to CCF once more in December 2015.  (Tr. 3463, 3498-3503, 3512-3516).  On admission, Pacl reported that, despite attending POTS rehabilitation two to three times and having done home therapy, she remained bedridden and required assistance with all activities, including taking medications, using the bathroom and cooking.  (Tr. 3513).  A 48 hour Holter monitor reported sinus rhythm with occasional sinus arrhythmia and frequent sinus tachycardia.  (Tr. 3490-3491).  She was discharged after receiving IV fluids over the course of the day.  (Tr. 3513).

In 2015, Dr. Janineh completed a medical source statement (Tr. 3021-3022), and in 2016 she wrote a two letters further documenting Pacl's physical limitations.  (Tr. 3504, 3505).

Pacl went to the emergency room approximately 60 times in 2016 for ongoing chest pain, tachycardia, abdominal pain and upper respiratory issues.  (Tr. 3509-3511, 3517-3570, 3587-

3590, 3593-3596, 3606-3609, 3617-3631, 3658-3821, 4020-4089, 4101-4109, 4638-4724, 4762-4829, 4832-48590.  She was admitted three times in January with tachycardia associated with dizziness and chest pain made worse by a gastrointestinal infection.  (Tr. 3509-3533, 3517-3541, 3555-3570).  She was admitted at CCF on January 9, 2016 with a POTS diagnosis.  (Tr. 3523).  Her heart rate was in the 70s at rest and went up to 140 bpm upon standing.  (Tr. 3523).  Her evening dose of atenolol was decreased and she received IV fluid hydration.  (Tr. 3525).  She was discharged on January 10, 2016 with the diagnosis of tachycardia, POTS, anxiety disorder and EBV infection.  (Tr. 3524).  She returned to the emergency room less than an hour after being discharged with an increased heart rate of 180 bpm, dizziness, diarrhea, nausea and low abdominal pain.  (Tr. 3527).  Her stool culture was positive for C diff.  (Tr. 3539).  Pacl was hospitalized again on January 16, 2016 at SWGH with symptoms of tachycardia and diarrhea. Her heart rate was 170 bpm when she arrived at the emergency department.  She was frustrated with her dysautonomia specialist at CCF.  (Tr. 3557-3570).

Pacl began treating primarily at UH facilities in late January 2016.  An infectious disease specialist recommended daily fluids via PICC line for at least six months for generalized weakness and chronic infection.  (Tr. 3802).  On January 30, 2016, emergency room notes state that Pacl had been seen at University Hospital five times and no significant source had been found for her problems.  (Tr. 3781).

Pacl was seen in the emergency room at least 10 times in February 2016 for complaints of chest pain, palpitations, tachycardia, dehydration and epigastric pain.  She was admitted to the hospital twice.  (Tr. 3623-3631, 3721-3780).  On February 5, 2016, she went to the emergency room with rapid heartbeat, chest pain, palpitations with tachycardia, chronic malaise, chronic weakness and chronic abdominal pain.  (Tr. 3767-3775).  Her speech was extremely pressured

she had somewhat poor insight and was extremely anxious.  (Tr. 3769).  The attending physician noted that standard work-ups had not provided any medical reason for her symptoms and opined that a great deal of her symptoms may be psychiatric.  (Tr. 3770).  When she went to the emergency room on February 24, 2016, her heart rate was in the 160s when standing.  She was given multiple liters of IV fluids and her heart rate increased slightly.  (Tr. 3625).  The attending physician again noted that it was unclear the true etiology of Pacl's symptoms.  However, the doctor noted that it could not be denied that Pacl's heart rate changed with position.  (Tr. 3625).

Pacl continued treating at emergency departments for tachycardia, chest pain, dizziness, abdominal pain, anxiety, diarrhea, fever and difficulty breathing.  (Tr. 3542-3547, 3672-3720, 4020-4109, 4638-4724, 4762-4859).  On April 11, 2016, Pacl went taken by EMS to the emergency room with rapid heartbeat, palpitations, sharp/stabbing chest pain and pressure with ambulation.  She had recently increased her "amount of movement" on advice of her doctor.  (Tr. 3675).  Her labs, x-rays and EKG were normal and she was discharged after her palpitations and POTS resolved.  (Tr. 3678-3679).  On May 10, 2016, the emergency room physician noted that Pacl's heartrate increased to 145 when she moved around in the bed.  (Tr. 3562).  She continued to make emergency room visits when IV fluids at home did not relieve her symptoms.  (Tr. 4715, 4835-4836, 4855).  On October 15, 2016, a 23 hour observation was recommended for continued tachycardia not resolved by normal saline and rest, but Pacl said that she wanted to go home. (Tr. 4719).

Pacl sought treatment outside Ohio for her condition with Dr. Derek Enlander of New York, New York.  On May 11, 2016, Dr. Enlander wrote a letter stating that he was treating Pacl for myalgic encephalomyelitis/chronic fatigue syndrome.  Dr. Enlander reported that Pacl was bedridden most of the time and used a wheelchair to move around.  Her condition was requiring

24 hour care, which was provided by her husband.  A protocol to boost her immune system had shown some improvement in her condition.  (Tr. 4236).

In March of 2017, Pacl sought treatment at the Mayo Clinic in Rochester, New York with neurologist and autonomic specialist Phillip A. Low, M.D. (Tr. 4485, 5464-5478).  After an autonomic screening, Dr. Low opined that Pacl had severe postural tachycardia syndrome, likely hyperadrenergic, with extreme deconditioning.  He recommended that she maintain a strict hydration routine (hoping to see her off IV fluids,) a trial of Interdal and midodrine, an abdominal binder to reduce venous pooling and a modified exercise routine with very slow increments in efforts to take approximately six months.  (Tr. 4485).

Pacl returned to the Mayo Clinic in June and July 2017 for a comprehensive evaluation with various specialty areas of the clinic.  She was to be further evaluated by hematology, gastroenterology, endocrinology, neurology, psychiatry, and sleep medicine.  (Tr. 5345-5349, 5473-5475).

Throughout 2017, Pacl was treated in emergency departments or admitted to CCF, SWGH, and UH-Parma on nearly 50 occasions.  (Tr. 4486-4623, 4727-4761, 5011-5022, 5045-5065, 5154-5179, 5197-5211, 5350-5372, 5424-5444, 5483-5567, 5810-5844, 5858-5877, 5903-5911, 5915-5954).  She typically presented with chest pain and rapid heartbeat unrelieved by her usual care at home.  (Tr. 4494, 4502, 4512, 4522, 4566, 4615, 4742, 4747, 4752, 4772, 5045, 5061, 5154, 5159, 5198, 5424, 5430, 5483, 5498, 5513, 5529, 5542, 5550, 5560, 5810, 5861, 5915, 5924, 5944).

In February 2017, Pacl had severe tachycardia while being treated for sinusitis in the emergency room.  (Tr. 4566, 4571).  On March 5, 2017, the attending physician at the emergency room did not feel that it was appropriate to release Pacl given her ongoing discomfort

and pain even after medication and fluids were given and she remained tachycardic.  (Tr. 4548).

On March 14, 2017, Pacl went to SWGH with her "heart racing" and palpitations after a recent

discharge from CCF where her PICC line had been removed due to blood clots.  (Tr. 4522).  Her

physical therapist providing at-home care called EMS after finding Pacl in critical condition.

Because her heartrate continued to be high even after IV fluids were administered, she was

admitted to the hospital again.  (Tr. 4522).

Pacl saw Dr. Robert Wilson at CCF for a neurological consultation on May 30, 2017.

(Tr. 5115-5153).  Pacl reported feeling best when she was sleeping and felt "good" for only a

few minutes.  She required bed rest and IV fluids and had a 40-hour home health aide, service

dog, home oxygen and defibrillator.  (Tr. 5115).  Dr. Wilson was unable to determine the root

cause of her disorder and did not feel that he could help her, despite his interest in autonomic

disorders.  (Tr. 5123).

On June 12, 2017, Pacl went to the emergency room with worsening symptoms; she felt

weaker than usual with generalized pain, inability to eat and an inability to sit up due to known

baseline deconditioning and POTS.  She reported being bed-bound for approximately three years

(except for a couple days each month) with ongoing fatigue, dizziness, fainting, severe

tachycardia while upright and generalized pain in her abdomen.  (Tr. 5198).  She was treated

with IV fluids and started on atenolol, but Pacl refused to take the medication.  The attending

physician could not tell whether Pacl was doing anything to ameliorate her POTS.  (Tr. 5198-

5199).

Pacl saw rheumatologist, Leonard Calabrese, D.O., at CCF on September 8, 2017.  He

reviewed a "large amount of data" from other CCF physicians.  (Tr. 5373-5399).  Physical

examination showed positive tenderness of myofascial tissues and significant hypermobility.

(Tr. 5384).  Dr. Calabrese's impressions were: POTS, EDS (Ehlers-Danlos syndrome), diffuse pain and somatoform features.  (Tr. 5384)  He opined that Pacl's condition had immunologic features consistent with some immunedysregulatory disorder.  He favored referring her to a rare disease program ant NIH.  He had no opposition to empiric intravenous immunoglobulin.  (Tr. 5385).

Pacl had a loop recorder placed in October 2017 and a port venous access was inserted in December 2017 for central IV and IVIG because she continued to have vascular issues at the site of her PICC line.  (Tr. 5800, 5849, 5903-5911).

Daniel Cameron, M.D., of Mount Kisco, New York, evaluated Pacl in January 2018 for possible Lyme disease.  (Tr. 5978-5986).  Pacl reported extreme tachycardia that left her wheel chair and bed-bound.  (Tr. 5982).  He offered a working diagnosis of tick-borne illness based on available history, physical examination and diagnostic testing.  He prescribed Malarone.  (Tr. 5985-5986).

Pacl followed-up with Dr. Bryan Baranowski at CCF's department of Cardiac Pacing and Electrophysiology in February 2018.  (Tr. 6045-6062).  Dr. Baranowski noted Pacl's longstanding history of tachycardia and her reluctance to try ivabradine because she wanted to discover the cause of her tachycardia prior to treating it.  (Tr. 6045-6046).  Her loop recorder showed 143 tachycardic detections (150-173 bpm) since October 5, 2018.[3]  (Tr. 6046).  Dr. Baranowski found no evidence of organic pathology to explain her severe somatic symptoms.  (Tr. 6053).  He suggested that Pacl continue to follow-up in the autonomic dysfunction clinic

---

[3] The court presumes this reference to 10/5/18 was a typographical error which should have stated 10/5/17.  The visit on which the data was reported occurred on February 6, 2018, and the note stated Pacl had been treated by Dr. Mayuga on 10/2/17.  (Tr. 6045-6046).

with cardiologist Dr. Mayuga, and he planned to talk with him about a formal evaluation of Pacl for somatic symptom disorder.  (Tr. 6053).

Pacl's visits to emergency rooms continued through the hearing date in March 2018.  (Tr. 6140-6154, 6181-6214, 6215-6247, 6248-6277).  In January 2018, Pacl was sent to the emergency department from interventional radiology when her heart rate was in the 170s-180s accompanied by chest pain.  (Tr. 6147).  She was treated with IV fluids and released.  (Tr. 6151).  In February 2018, Pacl had a syncopal episode upon entering the emergency department.  (Tr. 6189).  She was treated with IV fluids and released in stable condition.  (Tr. 6193).  In March 2018, after receiving IVIG treatment at an outside clinic, Pacl's chest port became clogged, her heart rate elevated to above 200 bpm and she was told to go to the emergency department.  She reported mid-sternal chest pain and feeling like she was going to pass out.  (Tr. 6219).  Her heart rate improved after receiving IV fluids and she was discharged.  (Tr. 6224).

### B.     Relevant Opinion Evidence

#### 1.     Treating Physician - Dr. Janineh, D.O.

Pacl treated with Dr. Jouliana N. Janineh, D.O., beginning in August 2014.  (Tr. 2557-2575, 2761-2783, 3832-3937, 3942-3947).  On September 11, 2014, Dr. Janineh noted that Pacl was unable to do normal activities because of her POTS; she got extremely dizzy and her heart rate accelerated.  (Tr. 2563).

On June 3, 2015, Dr. Janineh opined that Pacl would be able to lift/carry up to 10 pounds, stand/walk for one hour without interruption for a total of two hours in an eight hour work day; had no sitting limitations; could rarely climb and balance; could occasionally stoop, crouch, kneel, crawl, reach, push/pull, and use gross manipulation; and could not work around moving machinery or temperature extremes.  (Tr. 3021-3022).  Dr. Janineh noted that Pacl had been

prescribed a wheelchair and opined that she would require 20 minute rest periods every two

hours in addition to regularly scheduled breaks.  (Tr. 3022).

On March 2, 2016, Dr. Janineh authored a letter stating that Pacl was on bed rest with a

PICC line and was unable to ambulate due to her chronic illnesses.  (Tr. 3504).  She wrote

another letter on April 20, 2016 stating that Pacl was still extremely debilitated by her autonomic

disorder which caused weakness and dizziness; required assistance in daily living tasks; used a

wheelchair; and received daily medical treatments.  (Tr. 3505).

### 2.    Treating Physician - Dr. John Jewell

Dr. John Jewell started treating Pacl in April 2017.  Dr. Jewell prepared a letter in support

of Pacl's admission to the Undiagnosed Diseases Network.  (Tr. 6063-6066).  Dr. Jewell stated

that Pacl's symptoms left her primarily confined to a wheelchair and dependent on her husband

and home health care providers for assistance with activities of daily living.  (Tr. 6063).  He

reported that, despite extensive testing at both CCF and the Mayo Clinic, a diagnosis had not

been firmly established.  (Tr. 6063).  He reported the following symptoms: rapid heartbeat, chest

pains, severe headaches, frequent sinus pain/infections, intermittent fevers, chills, drenching

night sweats, severe fatigue, somnolence, pain with deep inspiration, myalgias, right-sided

abdominal pain, difficulty eating, frequent nausea, numbness and swollen glands.  (Tr. 6063).

He stated that she had responded well to repeated courses of intravenous antibiotics and had

some temporary improvement while on them, but had not responded well to other treatments

such as beta blockers, Florinef or other oral medications.  (Tr. 6065).  A port had been placed for

intravenous access with consideration of starting immune globulin in December 2017; and Pacl

was given a loop recorder to record her tachycardic episodes in October 2017.  The downloads of

her loop recorder showed 28 symptom episodes, 209 tachycardic episodes and 319 pause

episodes.  Dr. Jewell opined that Pacl may suffer from an autoimmune condition that affected her ability to regulate her autonomic nervous system as well.  He also opined that a chronic infection remained a possibility.  (Tr. 6065).

### 3.    State Agency Consultants

On February 14, 2015, state agency reviewing psychological consultant, Carl Tishler, Ph.D., opined that Pacl's anxiety disorder did not meet or equal the severity of Listing 12.06. (Tr. 1955-1956, 1973-1974).  He opined that Pacl had mild limitations in activities of daily living and maintaining social functioning and moderate limitations in her ability to maintain attention and concentration for extended periods and in her ability to complete a normal workday and workweek without interruptions for psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  He opined that she should be limited to lower stress work without high production quotas or a fast pace and would have difficulty maintaining attention and focus to details over longer periods of time.  (Tr. 1960-1961, 1978-1979).  On July 27, 2015, Robyn Murry-Hoffman, Ph.D. reviewed Pacl's records and affirmed Dr. Tishler's opinions.  (Tr. 1988-1990, 1994-1995).

On April 27, 2015, state agency physician, Teresita Cruz, M.D., reviewed Pacl's file and opined that she could perform light work – occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, standing and/or walking for a total of about 6 hours in an 8 hour workday and sitting for a total of about six hours in an eight hour workday – with occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling, no climbing of ladders/ropes/scaffolds, and no work around unprotected heights or involving commercial driving due to her POTS and intermittent sinus arrhythmia.  (Tr. 1957-1959, 1975-

1978).  On July 19, 2015, Elaine M. Leis, M.D., reviewed Pacl's records and affirmed Dr. Cruz's opinions.  (Tr. 1988-1990, 1994-1995).

### 4.  Examining Physicians

On February 2, 2015, Judith L. Rosenthal, Ph.D., examined Pacl at the request of the state agency.  (Tr. 2754-2758).  Pacl reported that she was unable to work because she was "having problems staying alive" and that being sick for a long time was taking a toll on her.  (Tr. 2754). She reported previous diagnoses of bipolar disorder, panic disorder and anxiety disorder which she attributed to her cardiac and other physical issues.  (Tr. 2755).  She attended the examination in a wheelchair.  She had rapid speech and a euthymic affect.  She described anxiety from being away from home, her "safe place."  (Tr. 2755-2756).  Dr. Rosenthal diagnosed anxiety disorder. She opined that Pacl's symptoms, as observed and reported, were primarily consistent with hypomania; however, Rosenthal acknowledged it was difficult to determine whether they were caused by a psychiatric disorder or her medical conditions.  (Tr. 2757).  Dr. Rosenthal opined that Pacl could understand, remember and follow directions without significant limitations; would have some limitations in attention, focus and pace; and would respond appropriately to supervision and coworkers.  She further opined that Pacl would become frustrated and upset when under work pressure or stress especially given her physical limitations.  (Tr. 2757-2758).

### C.  Relevant Testimonial Evidence

Pacl testified at the ALJ hearing.  (Tr. 1865-1869).  She initially stopped working because she was ill, dizzy and having a hard time standing up.  She had a positive tilt table test in August 2014.  (Tr. 1866).  Symptoms from her POTS included extreme heartrates reaching over 200 bpm, dizziness and confusion.

14

She was unable to get out of bed and used a bed pan.  She could not make any food for herself.  Someone helped her eat, bathe and dress.  She could not understand TV shows or speak for long times on the phone.  (Tr. 1867).  She had home health care 45 hours a week.  (Tr. 1868-1869).

She had received blood infusions in 2014.  She used an IV at home to help with her autonomic system and to lower her heartrate.  (Tr. 1868).  She had her first PICC line inserted in April 2015.  She also had an implanted loop recorder.  She used oxygen daily.  (Tr. 1869).

Medical Expert ("ME"), Robert Sklaroff, M.D., also testified at the hearing.  (Tr. 1870-1879).  He summarized the record and testified that Pacl's psychological issues could not be "denied when they are so prominent, but apparently so ignored."  He acknowledged that he is not oriented in psychiatry.  (Tr. 1871).  He stated that it was difficult to understand Pacl's need for oxygen and immune globulin injections.  (Tr. 1872-1877).  The ME also opined that there was no neurological explanation why Pacl needed to use a wheelchair.  (Tr. 1874-1875).  He opined that there were treatments available to Pacl that she was not using, such as the medication, Florinef.  (Tr. 1880-1881).  He opined that Pacl's impairments did not meet or equal a listed impairment and that she could perform medium work.  (Tr. 1879).

Vocational Expert ("VE") Robert Mosley, Ph.D., also testified at the hearing.  (Tr. 1884-1887).  The ALJ asked the VE to consider an individual of Pacl's age and education who had her RFC, as determined by the ALJ.  The VE testified that this individual would not be able to perform Pacl's former work as a retail store manager.  However, this individual could perform other jobs in the national economy.  The VE testified that this individual could not perform any jobs if she was off task at least 20% of the time.  (Tr. 1886).

## IV.    The ALJ Decision

The ALJ made the following paraphrased findings relevant to this appeal:

3. Pacl had the severe impairments of postural orthostatic tachycardia syndrome (POTS), somatoform disorder with anxiety, history of left eye blindness, history of remote thoracic compression fracture, fibromyalgia and chronic fatigue syndrome. (Tr. 1841).

4. Pacl's impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments. (Tr. 1842).

5. Pacl had the residual functional capacity to perform light work except for no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; no exposure to hazards (heights, machinery, commercial driving); and her mental limitations required that she perform routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes.) (Tr. 1845).

10. Considering Pacl's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform. (Tr. 1849).

Based on all these findings, the ALJ determined that Pacl was not under a disability from June 18, 2013 through the date of his decision. (Tr. 1850).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio

Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.    Treating Physician Rule

Pacl argues that the ALJ failed to follow the treating physician rule[4] by not assigning controlling weight to the opinions of Dr. Janineh and by failing to provide good reasons for the limited weight he assigned.  At Step Four, the Commissioner must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).  An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good

---

[4] 20 CFR §§ 416.927 applies to Pacl's claim because it was filed before March 27, 2017.

reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Good reasons for giving a treating source's opinion less-than-controlling weight include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; (2) inconsistency with or contradictory findings in the treating source's own records; and (3) inconsistency with other substantial evidence in the case record. *See Biestek*, 880 F.3d at 786 ("An ALJ is *required* to give controlling weight to a treating physician's opinion, so long as that opinion is supported by clinical and laboratory diagnostic evidence [and] not inconsistent with other substantial evidence in the record." (citing 20 C.F.R. § 404.1527(c)(2))); *Gayheart*, 710 F.3d 365, 376; *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (stating that good reasons include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."). But inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must assign weight to the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Nothing in the regulations requires the ALJ to

explain how he considered each of the factors.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c);

*Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of

each factor.").  However, the ALJ must at least provide good reasons for the ultimate weight

assigned to the opinion.  *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (acknowledging that,

to safeguard a claimant's procedural rights and permit meaningful review, 20 C.F.R. §§

404.1527(c) and 416.927(c) require the ALJ to articulate good reasons for the ultimate weight

given to a medical opinion).  When the ALJ fails to adequately explain the weight given to a

treating physician's opinion, or otherwise fails to provide good reasons for the weight given to a

treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939; *see also Blakely v.

Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good

reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even

whe[n] the conclusion of the ALJ may be justified based upon the record.'" (citing *Rogers*, 486

F.3d at 243)).

 The ALJ devoted just over three lines of text to his decision to assign "little" weight to

Dr. Janineh's opinion:

> At Exhibits B15F and B40-41F, Dr. Jouliana Janianeh [sic], another of claimant's
> physicians reports the claimant is either capable of sedentary work or that she is
> confined to a wheelchair.  Little weight is given these opinions.  There is evidence
> the claimant's gait is normal.  (Ex. B80F, page 67).

(Tr. 1847).  Pacl argues that the ALJ's assessment of Dr. Janineh's opinions was perfunctory at

best.  ECF Doc. 13-1 at 22.  The court agrees.  The regulations governing Pacl's claims required

the Commissioner to assign controlling weight to treating source opinions unless they were not

supported by medical evidence or were inconsistent with other substantial evidence in the record.

20 C.F.R. § 404.1527(c)(2).  Dr. Janineh's opinions *were* supported by medical evidence and

were consistent with one another.  As Pacl has argued, Dr. Janineh's own records documented,

20

as early as September 2014, that Pacl's symptoms from POTS rendered her unable to perform normal activities due to extreme dizziness and increased heart rate. (Tr. 2563). In June 2015, Dr. Janineh opined that Pacl could lift/carry no more than 10 pounds, could stand/walk for more than one hour at a time (for only two hours in an eight-hour workday), could only occasionally or rarely perform most postural activities and would require additional 20 minute rest periods every two hours. (Tr. 3021-3022). Later in March 2016, Dr. Janineh reported that Ms. Pacl was on bed rest, required a PICC line and was unable to ambulate due to chronic illness. (Tr. 3504). In April 2016, she stated that Pacl's POTS caused "extreme debility where she becomes very weak and dizzy requiring assistance in daily living and taking care of her child, patient is also transported by wheel chair." Dr. Janineh also noted that Pacl's condition was chronic and needed ongoing care and observation by her husband. (Tr. 3505).

Pacl has also cited other evidence in the record supporting Dr. Janineh's opinions that Pacl's dizziness and increased heart rate would impose significant limitations on her ability to perform work activity. (Tr. 3026, 3474, 3485, 3562, 4571, 4719, 6147, 6189, 6219). A physical therapist noted Pacl's increased heart rate with activity and rest and limited activity tolerance to ambulating 50 feet independently. (Tr. 3385-3386). Dr. Enlander noted that Pacl was extremely debilitated, was completely bedridden most of the time, and was using a wheelchair and required 24 hour care for personal activities such as bathing and dressing. (Tr. 4236). Dr. Low of the Mayo Clinic opined that Pacl's severe POTS left her extremely deconditioned. (Tr. 4485). Treating physician, Dr. Jewell, found that Pacl's symptoms caused confinement to a wheelchair and dependence on others for assistance with activities of daily living. (Tr. 6063). He noted objective information from Pacl's loop recorder supporting this finding. (Tr. 6065). Dr.

Cameron noted that Pacl presented with extreme tachycardia which remained a major issue and was the reason she was in a wheelchair and bed bound.  (Tr. 5982).

The Commissioner argues that the ALJ cited evidence supporting his decision.  For example, the Commissioner cites the ME's opinion that there was "no explanation neurologically for [Pacl] to need a wheelchair."  The Commissioner also cites the ALJ's decision, which stated that the ME had "the advantage of hearing testimony and reviewing the entire record."  (Tr. 1847-1848).  This is a disconnected argument given the ALJ's rejection of the ME's opinion that Pacl could perform medium work.  Instead, the ALJ adopted the opinions of the state agency physicians, who did not review Pacl's entire record.  And, the ALJ never discussed how Dr. Janineh's opinion compared to the ME's testimony or any other medical opinions.  Instead, the ALJ discounted Dr. Janineh's opinion based on a single data point: one treatment note stating that Pacl's gait was normal.  (Tr. 1847).  It appears that the Commissioner is now attempting to buttress the ALJ's decision regarding Dr. Janineh's opinion with evidence the ALJ never cited.  ECF Doc. 15 at 9.  The Commissioner's post-hoc rationalizations do not cure the ALJ's failure to provide good reasons for not assigning controlling weight to Dr. Janineh's opinions.  *Steckroth v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 44895, E.D. Mich. March 30, 2012, quoting *Hyatt Corp v. NLRB*, 939 F.2d 361, 367 (6th Cir. 1991) ("Courts are not at liberty to speculate on the basis of an administrative agency's order. . . . [nor is the court] free to accept 'appellate counsel's rationalization for agency action in lieu of reasons and findings enunciated by the Board.'") (citations omitted).

Furthermore, if the ALJ rejected Dr. Janineh's opinion based on the opinions of the state agency physicians (as the Commissioner argues), or even based on the ME's opinions, such reasons would not be "good reasons" under the treating physician rule.  Inconsistency with

nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion.  *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

An ALJ *must* give a treating physician's opinion controlling weight, unless he or she articulates good reasons for discrediting that opinion.  *Gayheart,* 710 F.3d at 376.  Good reasons for giving a treating source's opinion less-than-controlling weight include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; (2) inconsistency with or contradictory findings in the treating source's own records; and (3) inconsistency with other substantial evidence in the case record.  *See Biestek*, 880 F.3d at 786 (citing 20 C.F.R. § 404.1527(c)(2)); *Gayheart*, 710 F.3d 365, 376.  Given the size of Pacl's medical record and the numerous opinions and treatment notes supporting Dr. Janineh's opinions, the ALJ's citation to a single record which stated that "Pacl's gait was normal" was an insufficient reason for his assignment of little weight to Dr. Janineh's opinion.  And, the ALJ failed to discuss the other criteria the Commissioner is required to consider when weighing a treating source opinion.  He made no mention of the length and frequency with which Dr. Janineh treated Pacl, her area of specialization, or the other opinion evidence supporting her opinion.  Dr. Janineh's opinions were entitled to controlling weight unless they were inconsistent with substantial evidence in the record.  The ALJ failed to provide good reasons for rejecting Dr. Janineh's opinions.  Because he failed to follow the proper legal standards in assigning little weight to Dr. Janineh's opinion, the ALJ's decision must be remanded for further consideration consistent with this opinion.

### C.    Undiagnosed Somatoform Disorder

Pacl also argues that the ALJ erred in finding that she had the severe impairment of somatoform disorder but then finding that it was not disabling.  At the second step of the sequential analysis, the ALJ considers whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c).  A "severe impairment" is a medically determinable impairment that: (1) has more than a minimal effect on an individual's ability to perform physical or mental work; and (2) is "expected to result in death [or] to last for a continuous period of at least 12 months."  20 C.F.R. §§ 404.1509, 404.1522, 416.909, 416.922; see Salmi v. Sec'y of Health & Human Servs., 744 F.2d 685, 691 (6th Cir. 1985) ("'An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.'" (quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984))).  If the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find that the claimant is not disabled.  20 C.F.R. §§ 404.1520(c), 416.920(c).

Pacl's argument on this issue seems contradictory.  On the one hand, she argues that there was no diagnosis of somatoform disorder[5], and that the ALJ was not qualified to make such a diagnosis.  ECF Doc. 13-1 at 25.  On the other hand, she argues that the ALJ did not have substantial evidence to conclude that Ms. Pacl's somatoform disorder did *not* meet or equal listing 12.07.  The Commissioner argues that Pacl had the burden to show that she met or equaled Listing 12.07 and that she has not pointed to any objective medical evidence establishing that she met that listing.  The court agrees.  Pacl's own argument – that the ALJ made his own

---

[5] She acknowledges that there are references to possible somatoform features of her impairments in the medical records.

diagnosis of this impairment – undermines her contention that the evidence supported a finding that such an (undiagnosed) impairment met or medically equaled a listing.

Pacl has not shown that the ALJ erred at Step Two or Step Three of the sequential evaluation. Step Two is a threshold inquiry "intended to 'screen out totally groundless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). The ALJ cited evidence from the record suggesting that Pacl may have a somatoform disorder, and the ME testimony confirmed that impression. (Tr. 5384, 1871). Further, even if it was error for the ALJ to find that Pacl had a severe somatoform disorder, it is hard to see how such a finding could have resulted in any harm to Pacl. At worst, the ALJ inadequately evaluated in Step Three a disorder he was not required to evaluate. Because the court has already decided that the ALJ's decision must be remanded, he may choose to reconsider his finding of a severe somatoform disorder. The court would not remand on this issue alone.

### D.    Residual Functional Capacity

Finally, Pacl argues that the ALJ's RFC determination failed to address significant limitations imposed by plaintiff's severe impairments which would preclude the performance of sustained work activity. ECF Doc. 13-1 at 26. At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant

evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A plaintiff's residual functional capacity is defined as "the most a claimant can still do despite the physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.,* 342 F. App'x 149, 155 (6th Cir. 2009); see also 20 C.F.R. §§404.1545(a) and 416.945(a).  An ALJ may not determine the residual functional capacity by failing to address portions of the relevant medical record, or by selectively parsing the record – i.e., "cherry-picking" it – to avoid analyzing all the relevant evidence.  *Gentry v. Comm'r of Soc. Sec.,* 741 F.3d 708, 723 (6th Cir. 2014).

An ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and does not explain why he chose to credit one portion over another.  *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

Here, as already noted, the ALJ did not adequately explain why he did not include Dr. Janineh's opinions – or the opinions of numerous other providers – regarding Pacl's functional limitations in his RFC determination.  The ALJ's decision quoted (extensively) only a handful of medical records, all of which directly indicated or implied that Pacl has had a significant psychological overlay to her condition(s).  At the same time, the ALJ made scant mention of the

26

thousands of pages of medical evidence which showed that Pacl's POTS repeatedly caused her heart to become tachycardic to the point she needed to seek medical attention on dozens of occasions.  According to most of the medical providers, Pacl's POTS significantly limited her ability to perform activities of daily living.  It is quite evident that the ALJ concluded that Pacl had failed to demonstrate that she had any significant problems; or he concluded that her problems would all go away if she received some as-yet untried treatments.  Despite the ALJ's boilerplate recitation that he considered "the entire record" (Tr. 1845), the court agrees with Pacl that the ALJ cherry-picked the evidence and that his RFC determination did not account for the thousands of pages of relevant medical and other evidence that conflicted with his conclusions.  At a minimum, the ALJ failed to build a logical bridge between the evidence in the record and his stated conclusions.  *Fleischer*, 774 F. Supp. 2d at 877 (quoting *Sarchet*, 78 F.3d at 307 (7th Cir. 1996)).

Because the ALJ failed to follow the proper legal standards in determining Pacl's residual functional capacity, the ALJ's decision must be vacated and the case remanded for further consideration consistent with this opinion.

## VI.    Conclusion

Because the ALJ failed to apply proper legal standards in evaluating the weight to assign to Dr. Janineh's treating source opinion and did not appropriately consider all the relevant evidence when determining Pacl's residual functional capacity, the Commissioner's final decision denying Pacl's applications for DIB and SSI is VACATED and the case is REMANDED for further consideration consistent with this order.

Dated: May 4, 2020

Thomas M. Parker
United States Magistrate Judge